**Jesse D. FLEMING, Plaintiff,**

v.

**AMERICAN EXPORT ISBRANDTSEN LINES, INC., Defendant.**

**68 Civ. 1907.**

United States District Court,
S. D. New York.
March 10, 1970.

recover damages for injuries to plaintiff's left hand.

Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the issue of liability was tried to court and jury. In a special verdict, the jury held that defendant was negligent in respect to the condition of a certain table top or the lack of a guard on a circular saw in the carpenter's shop on board the SS Constitution and that such negligence was a proximate cause, in whole or in part, of the accident sustained by plaintiff with respect to his left hand on December 12, 1967. The same special verdict supported unseaworthiness. The jury also concluded that plaintiff had been contributorily negligent to the extent of 20%.

After trial on the issue of damages, the same jury rendered a special verdict for plaintiff for the following:

(a) Loss of past wages ............. $ 4,300
(b) Loss of future wages ........... 15,000,
which was based upon an average annual loss of $1,942.50 for a period of 10 years following the date of trial. A 5% discount reduced the amount to $15,000.
(c) Past pain, suffering and disability .. 5,700
(d) Future pain, suffering and disability 10,000.

This resulted in a gross amount of damages of $35,000, which was reduced by the 20% deduction for contributory negligence, to ............... $28,000.

At the end of plaintiff's case on liability, defendant moved to dismiss the complaint and for a directed verdict on the ground that plaintiff had failed to prove a case (107). The motions were renewed at the end of the entire case after the damage verdict (429). The court reserved decision on these motions (115, 437). After trial on the damage claims,[1] the defendant moved to strike plaintiff's claim for any loss of wages after November 7, 1968 on the ground that there was no proof of diminution of plaintiff's earning ability after that date and no proof that any job available to plaintiff, even with a good hand, would net plaintiff more in the future than he is actually earning (367). This was, in

Semel, Patrusky & Buchsbaum, New York City, for plaintiff; Alan H. Buchsbaum, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; James M. Estabrook, Lennard K. Rambusch, New York City, of counsel.

## OPINION

LEVET, District Judge.

This is a seaman's action, based on alleged negligence and unseaworthiness, to

---

1. Due to the problem of availability of medical witnesses, defendant's evidence was taken out of order and there was no clear-cut close of plaintiff's case.

essence, a motion for a directed verdict as to this element of damages. Decision was reserved (368).

After the jury verdict on damages, the defendant moved to set aside the damage verdict as excessive and for a new trial on the grounds that (a) the award of damages for future loss of earnings is not supported by the evidence; (b) the awards for pain, suffering and disability were grossly excessive; and (c) the jury's determination as to the percentage of plaintiff's contributory negligence was against the weight of the credible evidence (429–432, 439).

## I.

### THE MOTIONS TO DISMISS THE COMPLAINT AND FOR A DIRECTED VERDICT

#### PLAINTIFF'S PROOF

Plaintiff's contentions as to liability of the defendant were based on the condition of a certain circular saw and saw table top as the same existed in the carpenter's shop on board defendant's vessel, SS Constitution, where plaintiff, the ship's carpenter, was required to work. The specific negligence and unseaworthiness alleged consisted of two claims—(1) that the said table top was defective, and (2) that the circular saw lacked a guard.

The particular occasion on which plaintiff was using this saw grew out of an order by the chief officer to make a shelf for the captain (28).[2] A diagram with specifications was handed to plaintiff (29). Plaintiff, taking the diagram to the carpenter's shop, took a piece of $3/4''$ plywood approximately 4' x 8' which he cut to size (3' x $1\frac{1}{2}'$) with a portable hand saw (69–70). He then prepared to make a "dado groove" $3/8''$ deep along the length of the board by use of the table saw (74). While cutting this groove, plaintiff sustained his injuries. He testified that as he was standing forward of the table saw with the teeth of

the saw spinning towards him (76), he placed his left hand on top of the board and to the left of the saw blade, feeding the board towards the blade with his right hand (80). Plaintiff's words were as follows:

"When it got to a distance that I couldn't go any further with it, I reached to turn off the saw, holding one hand, my left hand on the table, on the wood securely, reached to turn off the saw and apparently I put too much weight or pressure on the table and the top went ajar, the wood—the teeth jammed in the project that I am cutting, bringing it back, and the momentum throwing my hand into the blade, my left hand, and the momentum threw my hand into the blade. That is as simple as I can put it." (80–81)

In respect to notice, plaintiff testified that he requested repairs on the saw during the early part of 1967 (67) and complained that there was no guard on the saw blade (63, 65, 67). He said he last reported the alleged defects "five or six months before [the accident]" in approximately June of 1967 to the then chief officer whose name he could not recall (62, 63).

To support his contention as to the alleged defects in the table saw, plaintiff called one *Louis A. Bogumil, Sr.,* a carpenter's mate on board the same vessel, who testified that he had used the table saw some six or eight months prior to December 1967 to make certain cuts and that there was no guard (51, 58).

#### TESTIMONY FOR DEFENDANT

The defendant called *Richard Finocchio* and *John Murray,* who alternated as chief officer on the SS Constitution. Either Finocchio or Murray was assigned as chief officer during the period from March 1966 until the vessel was laid up in September 1968 (136). Finocchio and Murray each denied that he had ever observed any defects, or received any complaints of defects, or re-

---

**2.** Unless otherwise identified, numbers in parenthesis refer to pages in the trial transcript.

quests for repairs, either orally or in writing, from plaintiff, from the union or from any other source (28, 123–124, 137–138). As to the condition of the saw and table top, Finocchio testified that immediately after the accident he had proceeded to the carpenter's shop to visually inspect the table saw and that it appeared to be in good order (40–41). He also stated that he wrote out his investigation report (Ex. 1), using the table top of the saw as a desk, and that it did not shift under his weight (127–128).

Another witness for the defense, second mate *Louis Cafiero,* a wood hobbyist, testified that during June of 1967 he used the table saw to make several straight cuts on wood; that he used the saw with the permission of plaintiff, who did not warn him of any defects; and that he himself did not observe any defects (144–145).

A carpentry expert, one *Mauritz Ommundsen,* called by defendant, testified that it was not necessary to have a guard on this type of table saw for a grooving operation (170); that a guard would be more of a hindrance than a help during such operation (171); and that plaintiff could have used his portable Skil saw to make a groove if he wanted "to rig up for it" (174). Defendant points out that plaintiff himself considered the table saw safe (plaintiff's testimony, 89).

The defendant contends that the testimony in this case does not sustain a finding that the alleged defects were a proximate cause of the injuries and that, on the contrary, the overwhelming proof is that plaintiff's own negligence was either the sole cause for his injuries or was the cause to an extent greater than the 20% found by the jury. Defendant refers specifically to the following:

(a) Plaintiff failed to inspect the fittings that held the table top (plaintiff's testimony, 103). This, defendant claims, is peculiarly significant since plaintiff asserts the shifting of the table top as a cause of the accident.

(b) It was plaintiff's job to inspect the table saw (104).

(c) Plaintiff failed to tell the chief mate Finocchio, when plaintiff was asked to do the job, that the table saw was defective (99).

(d) Plaintiff should not have undertaken to use the table saw knowing of the defects (89).

(e) "Plaintiff failed to build up underneath the board which he was grooving with the blade * * *" (Ex. A).

(f) "Plaintiff reached to adjust the guard bar without turning off the saw" (Ex. A).

(g) Plaintiff failed to use an available portable saw when he knew of defects in the table saw (174).

(h) Plaintiff failed to use a push stick (97).

(i) Plaintiff leaned too much weight against the table top causing it to go ajar (80–81).

(Defendant's post trial memorandum, pp. 10–13)

While it may be that the jury could have believed that the lack of a guard on the saw was not a proximate cause of plaintiff's accident (see, e. g., Fox v. The S.S. Moremacwind, 285 F.2d 222 (4th Cir. 1960)), such a belief would not have been determinative since plaintiff's claim was also based on the shifting of the table top. It is true that defendant presented some evidence that the table top was not unstable, but this testimony was not conclusive and apparently the jury did not believe it. It may also be assumed that the jury believed plaintiff's proof as to a notice of defects being given to defendant.

■■ It is well established that the burden of proving contributory negligence of plaintiff in a Jones Act case is upon the ship owner. Candiano v. Moore-McCormack Lines, Inc., 251 F. Supp. 654 (S.D.N.Y.1966), aff'd 2 Cir., 382 F.2d 961 (1967), cert. denied 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968); Central Vermont Ry. v. White, 238 U.S. 507, 35 S.Ct. 865, 59 L.Ed. 1433

(1915); Mitchell v. United States, 396 F.2d 650 (6th Cir. 1968). The issue of contributory negligence is a matter clearly within the jury's province. Land O'Lakes Creameries, Inc. v. Hungerholt, 319 F.2d 352 (8th Cir. 1963).

■ It is true, of course, that if the plaintiff was injured entirely by his own negligence he could not recover under the Jones Act, Keel v. Greenville Mid-Stream Service, Inc., 321 F.2d 903 (5th Cir. 1963), but this case does not present such a situation. The condition of the table top, it may be concluded from the verdict and from the proof, was one of the proximate causes. It may well be that the facts would have sustained a greater degree of contributory negligence than 20%, see, e. g., Olsen v. Isbrandtsen Company, Inc., 209 F. Supp. 6 (S.D.N.Y.1962), but the jury has decided otherwise. In so doing, the jury, from the facts presented in this case, did not violate the principle that "contributory negligence becomes operative only when alternative courses of action are available to the injured party and he chooses the unreasonable course." DuBose v. Matson Navigation Co., 403 F.2d 875, 878 (9th Cir. 1968). Here, there was little, if any, testimony to convince the jury that plaintiff deliberately chose a course known to be unsafe. See, e. g., Asaro v. Parisi, 297 F.2d 859 (1st Cir.), cert. denied 370 U.S. 904, 82 S.Ct. 1250, 8 L.Ed.2d 400 (1962). The alleged alternative, use of the portable saw, is not a compulsory finding.

Unlike Pisano v. S.S. Benny Skou, 346 F.2d 993 (2nd Cir.), cert. denied 382 U. S. 938, 86 S.Ct. 389, 15 L.Ed.2d 349 (1965), there is no conclusion by court or jury here that the negligence of plaintiff was the sole cause of the injury.

All of these issues of liability and contributory negligence raised by defendant have been determined adversely to it by the jury. Obviously, the court should not substitute some other determination of fact in view of the fundamental rule that the evidence must be viewed in a light most favorable to plaintiff. O'Neil v. W. R. Grace & Company, 410 F.2d 908 (5th Cir. 1969).

■ The court is unable to say that no proof of negligence or unseaworthiness was adduced, or that any one of the conditions claimed was not a cause of the accident, or that the findings of negligence and unseaworthiness were unsupported. These determinations having been made by the jury, the court is likewise unable to conclude that the defendant has proved that contributory negligence on the part of plaintiff was greater than 20%, the amount specified by the jury, or 100%, as defendant claims.

Accordingly, the motion of defendant to dismiss the complaint and for a judgment notwithstanding the verdict on the ground that plaintiff failed to prove a case, and on the further ground that the accident was caused solely by plaintiff's negligence, must be denied.

## II.

### THE AWARD FOR PAST AND FUTURE PAIN, SUFFERING AND DISABILITY

■ Plaintiff's accident was on December 12, 1967. The trial was on December 30 and 31, 1969 and January 2 and 5, 1970. The jury award for past pain, suffering and disability was $5,-700; for future pain, suffering and disability, $10,000.

Plaintiff was hospitalized in St. Mary's Hospital, Hoboken, New Jersey from December 12, 1967 to December 18, 1967, during which time he underwent surgery, and was an outpatient there until January 1968 (263, 265, 266). Thereafter, from January 16, 1968 to May 3, 1968, he was an outpatient at the United States Public Health Service Hospital on Staten Island, New York (264). At his own request, he was marked "fit for duty" on May 3, 1968 (267, 360).

Plaintiff testified that he is unable to lower the left index finger so that it forms a "natural" fist (279). The left index finger can be bent only from the joint nearest the knuckle and is becom-

ing smaller (280); there is some atrophy at that extremity (354) and there is a "hook" at the end of the left index finger so that plaintiff is unable to straighten out that digit (280, 281).

Plaintiff also testified that he suffers continuous pain in the left index finger; that it is sensitive to the touch and on touch apparently has a sensation of "needles going through it" (281–283, 284). As to the left middle finger, plaintiff cannot bend the middle joint, but he has no complaints of pain in it, and, although he once had complaints of pain with respect to this finger, the pain had disappeared by the time of trial. There is some lack of gripping power (282–283).

*Dr. Arthur Friedman,* an orthopedic surgeon, called on behalf of plaintiff, testified from X-rays and stated that the X-rays showed that there was an increased amount of soft tissue swelling in the middle finger of the left hand; there is some flexion deformity at the distal joint but no evidence of fracture (350–351). As to the index finger, X-rays showed soft tissue swelling, considerable shortening and angular deformity created by abnormal healing or fusion so that the finger is now completely stiff (351, 353). Upon examining plaintiff on October 15, 1969, Dr. Friedman noted marked weakness in the gripping power of the left hand as compared to the right (355). Dr. Friedman stated that the soft tissue injury was a competent producing cause of pain. It was also his opinion that the injuries sustained by plaintiff were causally related to the accident in question; that plaintiff's complaints of pain were also related and were permanent in nature; and that plaintiff had a permanent loss in the use of the left hand, with pain (357–359).

On the other hand, plaintiff has not been required to take medication at any time (293) and his only present complaint of pain is with respect to the left index finger (294). There is no doubt, however, that plaintiff has some loss of use and some disfigurement of the index finger, which is permanent, and some loss of flexion and disfigurement of the middle finger, and while there is no pain in the middle finger, there is pain and sensitivity of the index finger.

Under all the circumstances I find that the jury's verdict of $5,700 for past pain, suffering and disability was not excessive.

While the $10,000 allowed by the jury for future pain, suffering and disability may seem generous, I believe that it is no so excessive as to "shock the conscience" of the court.

In light of the foregoing, defendant's motions to set aside the verdicts for past and future pain, suffering and disability are denied.

### III.

### MOTIONS WITH RESPECT TO THE VERDICT OF DAMAGES FOR LOST WAGES

The verdict on the claim for *past* lost wages of $4,300 appears not to have been contested by defense counsel.

Plaintiff's claim for lost wages *in the future* was based upon proof of an average salary of $10,000 per year before the accident when he was employed by the defendant as a ship's carpenter, compared with $7,800 annually earned commencing on November 7, 1968, when plaintiff began employment as a security guard at the National Maritime Union Hall. The claimed annual differential is $2,200. What has been denominated "future loss of earnings" is, in reality, a claim for the impairment of future earning capacity. 22 Am.Jur. 2d, Damages § 89. The jury awarded plaintiff $15,000 for future lost wages.[3]

---

3. The peculiar basis of the jury's computation of its award for future lost wages is of interest. Under 2(a) of the special verdict, the jury stated that the average annual loss of wages would be $1,942.50, and under 2(c), the period of the loss would be 10 years. The result of the multiplication was $19,425. The total, after application of a 5% discount factor for the present worth of the future loss, came

At the close of the trial on damages, Mr. Estabrook, counsel for defendant, moved to strike any claim for future lost wages on the ground that there had been no proof of any diminution of plaintiff's earning ability after November 7, 1968. He argued that plaintiff had presented no proof that after that date "any job available to plaintiff at all, even with a good hand, would net plaintiff more than plaintiff is actually earning [i. e., $7,800]" (367). The court reserved decision on this motion.

The bases of defendant's attack on this verdict are in effect (1) that, as a matter of fact, subsequent to the accident plaintiff was able to work, and did work, at his former occupation as ship's carpenter on the same ship, the SS Constitution, between May 17, 1968 and August 31, 1968 (immediately prior to the time · when the SS Constitution was withdrawn from service); (2) that inability to work as a carpenter or other work at sea has not been shown; and (3) that plaintiff has failed to show that there were any openings for ship's carpenters on any American passenger vessels since December 1968.

As stated above, on a motion for judgment notwithstanding the verdict the evidence must be considered in a light most favorable to the plaintiff.

### ABILITY TO PERFORM DUTIES AS A SHIP'S CARPENTER

Plaintiff attended high school for three and a half years and then studied carpentry at a vocational school in New York City (251). At sea he served in various positions for 27 years (252–257, 260).

Dr. Friedman, formerly connected with the United States Public Health Service Hospital in Staten Island, testified as to the nature and effect of plaintiff's injury (see discussion under pain and suffering, supra) and offered his opinion that plaintiff's injuries were permanent and resulted in a permanent loss of use of his hand, and that plaintiff was unable to work as a carpenter after the accident (358–359). It may be questioned how impressive this testimony is in light of the fact that plaintiff actually did work as a ship's carpenter during the period from May 17, 1968 to August 31, 1968, shortly before the ship was taken out of service (148–149, 151, 267). As a matter of fact, Dr. Friedman admitted that seamen lost fingers and still returned to sea and used ladders (363).

Dr. Vincent Lodico, a general surgeon specializing in traumatic surgery, testifying for defendant, stated that on December 29, 1969 the plaintiff was able to work as a ship's carpenter, could climb ladders, and fully do the work of a carpenter in spite of his injuries (329–330, 342).

Plaintiff himself testified that he was unable to perform the work required of a carpenter on land as he could not hold nails to do flooring or work on the side of a shaft securely (277–278). He also stated that he could no longer do the heavy work of an able bodied seaman (273–274), but admitted that he has not applied for any sea-going job since November 1968 (288–289).

Plaintiff, at his own request, was marked "fit for duty" by the Public Health Service Hospital on May 3, 1968; the hospital record indicated that it "[w]ill consider surgery August [1968]" and that plaintiff was to return to the clinic whenever necessary (267, 360). However, the testimony of Finocchio and Murray, plaintiff's superiors on board the SS Constitution, clearly indicated that plaintiff's duties as ship's carpenter during the period from May

---

to $15,000. It is apparent, without much analysis, that the jury must have first determined arbitrarily that the amount should be $15,000 and then decided 2(a) at $1,942.50 and 2(c) at 10 years, thus arriving at the result.

The court does not consider the fact that the amount of the verdict may have been arrived at in this manner to be a basis for upsetting the jury's determination.

1968 to August 1968 were satisfactorily performed and that he made no complaints of injuries impeding such performance (Finocchio, Murray, 148–149, 151).

Plaintiff, on the other hand, testified that after returning to work on board the SS Constitution on May 17, 1968 in the capacity of ship's carpenter, he was unable to perform the duties of carpenter as he had done in the past and was forced to rely on the help of other crew members to perform work which he had previously managed to do unassisted (267–271).

The jury may be presumed to have concluded from this testimony that, despite the fit for duty certification, after the accident plaintiff was not, in fact, fit and able to perform the duties of ship's carpenter. Hence, the court is unable to say that there was no evidence from which the jury might have reached such a conclusion.

Although the proof by plaintiff of permanent inability to work at his calling is not too convincing, under the applicable rule, no action by this court may be predicated on this specific feature.

## AVAILABILITY OF EMPLOYMENT AS A SHIP'S CARPENTER

■ Defendant's final contention with respect to the verdict for future loss of earnings is that plaintiff has failed to show that there were or are any positions available at which he could earn more than he is presently earning, even if uninjured.

It was conceded that the employment of ship's carpenters by American Export was confined to passenger ships and that there has been a marked decline in the number of American passenger vessels in recent years. Defendant's SS Constitution was taken out of service in September 1968 and its SS Independence, its last passenger ship, was laid up in December 1968 (136, 151, 154–155).

When plaintiff left the SS Constitution in August 1968, he "put in his card" at the union hall (the normal employment procedure) as a ship's carpenter. He was also entitled to ship as an able bodied seaman under the same card (272). Although John Murray, for defendant, testified that at the time of trial there were two passenger vessels operating out of the east coast and there had been more in 1967 (154–155), plaintiff presented no evidence to indicate that there now are jobs available as ship's carpenters, even to employees who have suffered no injury.[4]

On the oral argument to set aside the damage verdicts, following the jury verdict, plaintiff's counsel conceded that American Export Lines does not place ship's carpenters on freighters. There was no testimony as to what other companies do. It was admitted that no jobs were offered to plaintiff although he "put in his card" (433, 435). The position taken by plaintiff's counsel amounts to a contention that there was a burden on defendant to submit testimony with respect to unavailability of carpentry jobs (436). This disregards the fundamental principle that the burden of proof is upon plaintiff to prove his damages. "The law is well settled that the burden of proof is upon the party claiming the damage to prove that he has suffered damage and to prove the elements thereof with reasonable certainty." Peters v. Lines, 275 F.2d 919, 930 (9th Cir. 1960); Dixon v. Pennsylvania Railroad Company, 378 F.2d 392, 394 (3rd Cir. 1967). There is no reason to hold that

4. Joseph Hirsch, who relieved plaintiff as carpenter until plaintiff returned to the ship in May 1968, is now employed in the same job as plaintiff and at the same rate of pay at the Maritime Union. Plaintiff's one-time carpenter's mate, Louis A. Bogumil, Sr., is now employed as a school custodian (291). Neither Hirsch nor Bogumil was handicapped by injury (152, 58).

this principle is inapplicable to this element of proof. It is elementary that no verdict may be based upon conjecture.

In discussion with the court, counsel for plaintiff in substance stated "that there are no carpentry jobs available aboard vessels" and that "[n]o one has even disputed that" (368). Apparently, plaintiff's counsel was satisfied with the contention that "the man says he can't work" and that diminution of earnings can be shown "by what he earns now and what he earned before and he says he can't do any work but what he is doing," and further stating that "were there jobs of ship's carpenter available, he can't do it" (370, 371).

The major foundation of plaintiff's claim, that had he not been injured he could have earned $10,000 or more per year as a ship's carpenter, or otherwise, is absent since there was no market for plaintiff's talents.[5] There is no reason to charge defendant for any economic loss to plaintiff which resulted from the lay-up or decline in the use of American passenger vessels.

The motion to strike plaintiff's claim for future lost wages must be granted notwithstanding the verdict.

## CONCLUSION

All motions of the defendant except as to future loss of wages are denied.

Accordingly, the gross judgment is to be reduced by elimination of $15,000 and entry of judgment for plaintiff in the sum of $16,000 together with costs and disbursements is hereby directed.

So ordered.

5. If this court should take judicial notice of the present condition of the American passenger traffic (as plaintiff's counsel requested (436–437)), it would be evident that there are few American-owned passenger-carrying vessels. Two American passenger vessels, the SS United States and the SS America, were decommissioned last fall. True, there are various foreign lines in the passenger trade between the United States and Europe and elsewhere, but wages on foreign ships are 80% of American standards. The airlines have generally superseded passsenger liners.