**Ray OLSEN, Plaintiff,**

v.

**ISBRANDTSEN COMPANY, Inc., Defendant.**

United States District Court
S. D. New York.
Sept. 20, 1962.

Kenneth Heller, New York City, for plaintiff.

Dougherty, Ryan, Mahoney & Pellegrino, New York City, for defendant; Thomas J. Short, New York City, of counsel.

EDWARD WEINFELD, District Judge.

Plaintiff, formerly chief mate aboard the s/s Columbia Heights, owned and operated by the defendant, seeks to recover damages arising out of injuries sustained by him while the vessel was docked at a pier at Ocho Rios, Jamaica, British West Indies.

Plaintiff was injured as he stepped off the ship's gangway ladder when the vessel suddenly surged aft and his right foot was caught by the roller at the dock end of the gangway. In order to prevent crushing of his leg as the vessel continued to surge, the plaintiff threw himself to the dock with his left foot in the air but the roller moved back and forth over his right foot until the gangway was lifted by crew members. He charges the defendant with negligence and unseaworthiness of the vessel, the essence of which revolves about the failure to keep the vessel safely moored and the lack of reasonably adequate equipment and personnel to carry out that function.

Ocho Rios Bay is an open roadstead with swells coming in from the open sea. Because of the continuous swells, vessels berth eight to ten feet from the pier in order to prevent their pounding against the dock. Two buoys, anchored in water, are located about 450 feet off the dock and vessels are moored with lines to the buoys as well as to the pier.

The s/s Columbia Heights arrived at Ocho Rios on Sunday, December 23, 1956 at about 7 A.M. and was docked starboard side eight to ten feet off the pier. She was secured to the pier and the offshore mooring buoys with ten mooring lines, five forward and five aft, of fabricated manilla seven or eight inches in diameter. Eight of these lines ran inshore to the dock and were secured as follows: two from the port and starboard gypsy heads located forward to the dock and one line from the aft capstan to the dock; the balance to fixed bitts. Two lines ran offshore, one from the forward, and the other from the aft, part of the vessel to the offshore mooring buoys on the port side; these lines were practically abreast of the bow and of the stern at approximately ninety-degree angles. When the vessel was secured, the mooring buoys were about 350–400 feet abeam of the ship which was sixty-two feet in width.

The gangway was rigged at a forty-five degree angle leading aft. It was of steel construction and weighed approximately 2000 pounds. It had a swivel at the deck end and a metal roller at the dock end; the roller was twenty-two inches wide and six inches in diameter and protruded at the forward edge of the dock end. As the vessel surged the gangway moved first on the swivel and then rolled upon the roller. An intended purpose of the roller was to prevent damage to the dock when the vessel surged.

Prior to the commencement of loading, the vessel was secured in a seaworthy fashion; the mooring lines were hoved up tight and there was no appreciable motion of the ship. At about 8 A.M. the vessel commenced to receive cargo by means of a shoreside movable chute and conveyor at the rate of 1000 tons an hour, which increased the vessel's draft twenty-two inches an hour. From the

start of loading operations to 10:40 A.M., when plaintiff was injured, the draft of the vessel increased in excess of fifty inches and as a result the inshore mooring lines became increasingly slack but were not taken in or made taut.

At all times during the loading there were heavy swells causing the vessel to surge with each swell at times as much as six and eight feet fore and aft. The vessel was in continuous motion, rising and falling and surging in toward the dock.

Shortly before plaintiff met with his accident, the ship surged up and down six to eight feet. The plaintiff, at about 10:40 A.M., walked down the gangway in order to make preparations to move the vessel forward; as he came to the end of the gangway and stepped down with his right foot onto the dock, a fast, strong swell caused the ship to surge aft, causing the gangway roller to roll over his right foot as already described. Clearly the huge surge was the result of failure to make the mooring lines taut as they became increasingly slack during the loading operations.

■ The defendant was under an absolute duty to plaintiff to furnish a seaworthy vessel—a ship and appliances that were reasonably fit for their intended use.[1] It was also under a duty to exercise reasonable care to afford plaintiff a reasonably safe place to work, which duty extended to the means of ingress and egress to and from the vessel.[2] While these separate duties rest upon different legal concepts,[3] in end result they require the shipowner to furnish a reasonably safe ship and place in which to work, the practical difference being that in the instance of an unseaworthiness claim notice to the owner of the condition is immaterial, whereas in a negligence claim it is an essential element of liability.[4]

■ We consider first the claim of unseaworthiness. While the duty of the owner to furnish a seaworthy vessel is absolute, whether or not a vessel is in fact seaworthy involves a relative concept dependent in each particular case upon time, place and other factors.[5] What may be seaworthiness under one set of circumstances may be unseaworthiness under different circumstances. The basic inquiry is whether, under all the circumstances, the vessel was reasonably fit for plaintiff to carry out his job with reasonable safety.

■ The Court is persuaded that the gangway which moved with each surge of the vessel was not, under the prevailing conditions, reasonably fit for its intended use. The roller which yielded with each surge because of the excessively slack lines rendered the gangway

1. Mitchell v. Trawler Racer, Inc., 362 U. S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Van Carpals v. The S.S. American Harvester, 297 F.2d 9 (2d Cir.1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84 (1962).

2. Buch v. United States, 122 F.Supp. 25 (S.D.N.Y.1954), aff'd as to unseaworthiness and negligence and rev'd as to maintenance and cure, 220 F.2d 165 (2d Cir. 1955). See Vanderlinden v. Lorentzen, 139 F.2d 995 (2d Cir.1944).

3. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Rich v. Ellerman & Bucknall S.S. Co., 278 F.2d 704 (2d Cir.1960); Poignant v. United States, 225 F.2d 595 (2d Cir. 1955).

4. Mr. Justice Frankfurter, in his concurring opinion in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 418, 74 S.Ct. 202, 98 L.Ed. 143 (1953), commented: "Since unseaworthiness affords * * * recovery without fault * * * it will be rare that the circumstances of an injury will constitute negligence but not unseaworthiness."

5. See Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348 (1933); Lester v. United States, 234 F.2d 625 (2d Cir.1956); Krey v. United States, 123 F. 2d 1008 (2d Cir.1941); Zinnel v. United States Shipping Board Emergency Fleet Corp., 10 F.2d 47 (2d Cir.1925); Henry Gillen's Sons Lighterage, Inc. v. Fernald, 294 F. 520 (2d Cir.1923).

dangerous at the time the plaintiff was injured and constituted an unseaworthy condition. Had the lines been made taut, there would have been relatively little movement of the ship. It is true that surging of a vessel is to be expected with swells and normally a vessel would not be rendered unseaworthy solely by reason thereof; but here the vessel was surging as much as six to eight feet with each swell for some time before the accident and only because of the failure to make the lines taut as loading progressed and the draft increased. Proper lines would have reduced the surge considerably and thus the likelihood of injury to those using the gangway.

Since the hazardous condition of the gangway was the result of failure to maintain taut lines, it is unimportant whether this failure, as the plaintiff urges, was due to lack of snatch blocks on board the vessel capable of use in conjunction with the mooring lines or to lack of adequate crew in number. The fact is that the lines were permitted to become and remain excessively slack; it was this in combination with the roller which proximately resulted in rendering the gangway not reasonably fit for its intended use. The condition existed long enough prior to the accident to charge the master with notice sufficient also to sustain the claim of negligence.

 The defendant seeks to avert liability, contending that the plaintiff, by reason of failure properly to discharge his duties as chief mate, was responsible for the unsafe condition. Even if this were so, it would not exonerate the defendant entirely, but only serve in mitigation of damages.[6] The Court is satisfied that the plaintiff must share part of the responsibility for the occurrence. He was the officer in charge of the loading and was as familiar with conditions as the master. He was required during loading operations to see

to it that the vessel was safely moored and the lines properly maintained. His testimony to the effect that he was engaged with tasks relating to the stow and trim of the vessel and hence unaware of the slack lines or heavy surging is unpersuasive. He knew the rate at which the cargo was being loaded aboard the vessel and the consequent increase in its draft. He testified that he was aware the ship was dropping fast and that the lines was getting slack quickly.

Also lacking in substance is plaintiff's disclaimer of responsibility based on the contention that it was the watch standing officer's duty to check and take in the mooring lines when required and that the latter's failure to do so cannot be attributed to him. As chief officer the plaintiff was second in command. The fact that the master, who was in absolute command, and that the watch officer, who was subject to plaintiff's direction and whose duty it was to check and take in the mooring lines when required, failed in their respective duties does not excuse the chief mate from a similar lapse of his duties. The plaintiff is chargeable with contributory fault.

 The defendant further seeks to defeat any recovery by the plaintiff or, in any event, to increase the extent of plaintiff's contributory negligence, contending that he knew that the vessel was surging heavily with consequent action upon the roller, thereby rendering it dangerous; that good seamanship required that instead of stepping forward and ahead when he came to the end of the gangway, he should have stepped off the side at a right angle in the space between a stanchion and the front edge of the gangway; alternatively, it contends that he did not step forward in accordance with prudent seamanship. However, even if plaintiff were negligent, either in the manner in which, or the route whereby, he stepped off the gangway, this would not, as defendant urges, bar com-

6. Rich v. Ellerman & Bucknall S.S. Co., 278 F.2d 704 (2d Cir. 1960); Grillea v. United States, 232 F.2d 919 (2d Cir. 1956). See Pope & Talbot, Inc. v. Hawn. 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

plete recovery, but would serve further to mitigate damages.[7] To step off sideways and at an angle at the open space between the stanchion and the edge of the roller would have required some unusual, if not gymnastic, action on the plaintiff's part under difficult conditions. The gangway was the sole means of access to the dock and it was to be expected that it would be used by the crew. On this aspect of the defendant's position the Court finds it has failed to sustain its burden of proof. However, since plaintiff was aware that the vessel was surging heavily, prudent conduct on his part as an experienced seaman required that before stepping forward onto the dock he wait until the vessel surged in the other direction and then step briskly ahead. In this respect his action contributed in part to the accident. In all, the Court finds that the plaintiff was contributorily negligent to the extent of fifty per cent and the damages which are next considered will be reduced accordingly.

The plaintiff was removed to a hospital at Ocho Rios where it was determined that he had sustained fractures without significant displacement of the right second metatarsal and internal malleolus. A cast was placed on his lower leg. Within several days he was flown to New York City where, commencing on December 28, 1956, he received treatment at the outpatient clinic of the United States Public Health Service. A new cast was put on which was removed February 25, 1957. The final X-rays show good union of the fractures. Plaintiff used crutches for a period of three months. He was found fit for duty on April 17, 1957 and returned to his employment with the defendant on April 20, 1957. The loss of wages until his return to work is the sum of $4,150.

The plaintiff continued to work for the defendant on bulk cargo vessels through April, 1959, when he left its employ for causes unrelated to his injury. In September, 1959 the defendant offered him a position on a general cargo vessel which, the plaintiff testified, he refused because he could not climb up and down ladders in the cargo holds, a task not required on bulk cargo vessels. In the two-year period thereafter, that is to July, 1961, he did not go to sea and he now seeks loss of wages for that period. However, it is acknowledged that during this period he was physically able to work on a bulk cargo vessel, and I am persuaded that he could have secured available employment without diminution of his usual earning power.

The question remains as to damages for the fractures sustained and for pain and suffering from the time of the accident to the present and in the future. Plaintiff undoubtedly experienced pain at the time of and following the accident. He testified that during the three-month period he was on crutches he had little pain; however, he felt pain when walking a lot, climbing up ladders or stepping on uneven surfaces. An orthopedic surgeon called as an expert witness for the plaintiff testified that the fractures were well healed and that the movement of the ankle and foot was within normal range. He found traumatic arthritis of the right ankle joint which, in the expert's view, was brought about by the accident; that this condition would cause pain on motion, which corroborated plaintiff's testimony on this subject.

The Court finds plaintiff is entitled to damages in the sum of $4,150 for loss of wages up to April 1957, when he returned to work, plus the sum of $10,000 for the injuries sustained, pain and suffering to date and likely future pain and suffering, or a total of $14,150 which, however, is subject to fifty per cent deduction by reason of his own contributory negligence, or a net award of $7,075.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

7. Palermo v. Luckenbach S.S. Co., 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3 (1957).