In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-2738

LESLIE D. MCPHERSON,

*Plaintiff-Appellant,*

*v.*

CITY OF WAUKEGAN,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 9264—**Amy J. St. Eve**, *Judge.*

ARGUED FEBRUARY 19, 2004—DECIDED AUGUST 11, 2004

Before CUDAHY, POSNER and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* While she was employed by the City of Waukegan (the City), Leslie McPherson alleges that she was sexually harassed, battered and subjected to intentional infliction of emotional distress by her supervisor, Randall Copenharve, and that the City forced her to resign. McPherson appeals the district court's grant of summary judgment on her Title VII claim of sexual harassment against the City, her claims that the City was liable for Copenharve's torts under a respondeat superior theory and her demand that the City indemnify any judgment against Copenharve. After considering all of the evidence in the light most favorable to McPherson, we affirm.

**I.**

McPherson began working for the City as a full-time Clerical Technician I in the Building Department on March 6, 1998. She was promoted to Clerical Technician II sometime around September 1999. McPherson's duties consisted generally of answering telephones, filing and issuing building permits to applicants. McPherson was one of two clerical technicians and reported directly to Edna Nieves, the supervisor of the Building Department, who in turn reported to Copenharve, the Assistant Building Commissioner. Michelle Weland was the office manager. McPherson took directions from both Nieves and Copenharve, but it was Nieves who conducted McPherson's performance reviews, and those reviews formed the basis for McPherson's pay raises throughout her tenure with the City.[1] McPherson had never been disciplined during her employment. Copenharve had worked for the City since 1969, and there had never been a complaint of sexual misconduct against him.

According to McPherson, Copenharve began making allegedly offensive comments to her starting about March of 1999, when he asked her what color bra she was wearing. McPherson claims that Copenharve asked this question openly in the office area a "handful" of times during her three years with the City. One of McPherson's co-workers, Michelle Brewington, testified at her deposition that Copenharve had made similar comments to her and that on at least one occasion the office manager, Weland, had overheard Copenharve ask the female staff, "Okay ladies, what color is your bra today, does it match the underwear?" On that occasion, Weland told Copenharve, "That's enough. It's time for you to get out and do your job." (Appellant's Br.

---

[1]  It is undisputed that Copenharve was McPherson's "supervisor" for purposes of her Title VII claim.

at 17; SA at 34-35.)[2] Brewington also testified that Nieves had been present when Copenharve asked the group of female employees this question and had laughed it off. (Appellant's Br. at 17; SA at 34-35.) While McPherson claims that the comments made by Copenharve offended her, she never mentioned his conduct to any of her supervisors and never told anyone that his remarks made her uncomfortable.

At another time during March 1999, McPherson called in sick and spoke with Copenharve. Copenharve responded by suggestively asking if he could "make a house call." He asked the same question two or three more times during the course of McPherson's employment with the City, but like the other times that Copenharve's conduct allegedly offended McPherson, she never complained of or reported his comments to anyone. Additionally, on several occasions Copenharve and others from the Department would wander over to McPherson's work station and browse through the Victoria's Secret catalogs in and on top of her desk. McPherson recalled an instance when Copenharve was looking through one of the catalogs, pointed to a particular outfit and suggested that she might look nice in it. This too allegedly offended her.

In late February or early March of 2001, Copenharve's conduct escalated to include physical contact. According to McPherson, at a time when they were unobserved by others, Copenharve asked her what color bra she was wearing and then pulled back her tank top with his fingers to see for himself. Although McPherson pulled away from Copenharve, she never mentioned his conduct to any of her supervisors and never told anyone, not even Copenharve, that his behavior made her uncomfortable. And things soon got worse.

---

[2] References to the Short Appendix attached to Appellant's Brief will be designated by "SA at __."

On March 21, 2001, Copenharve called McPherson into his office. She entered and closed the door behind her. No one could see into Copenharve's office once the door was shut. McPherson claims that, as she and Copenharve were discussing a work document, he slid his hand under her shirt and felt her breasts. She pulled away and asked him to stop, telling him that his hands were cold. Copenharve removed his hand from under her shirt and McPherson left his office. She finished the workday and returned to work the next morning. McPherson did not complain about or report Copenharve's behavior at the time.

Five days later, on March 26, 2001, Copenharve again called McPherson into his office and asked her to shut the door, which she did. McPherson asked Copenharve if he wanted to talk to her about a particular work issue, and he replied that he was just having a bad day and needed to be "cheered up." (SA at 27.) Realizing that Copenharve had nothing work-related to discuss with her, McPherson turned to leave his office. Copenharve got up from his desk, approached her and slid his hand under her shirt, touching her breasts. McPherson asked him to stop. Copenharve pushed her toward the wall behind his office door. He then put his hand down her pants and inserted his finger into her vagina. McPherson again asked Copenharve to stop and said, "Somebody is going to walk in." *Id.* Seconds later, Weland opened the door and walked into the office, saying that she had something for Copenharve. But as the door was opening, Copenharve pushed McPherson behind it, so Weland would not see her. Weland dropped something on the desk and left. Shortly afterward, McPherson also left Copenharve's office.

Despite what had just transpired, McPherson worked the rest of the day, during which she mentioned the incident to no one. On the following day, McPherson called her friend (and sister-in-law), Mary Vanderventer, who also happened to be the mayor's daughter, and told her something had

happened. She went to Vanderventer's house for lunch and told her (and a City attorney who was present) about the two incidents that had taken place in Copenharve's office. She then returned to work but soon afterward received a call from Vanderventer telling her that she could go home for the day. Between the time McPherson left Vanderventer's home and the time she arrived back at work, Vanderventer had contacted her father (the mayor) and told him what McPherson had told her. Later that same afternoon, the mayor met with Copenharve, another City attorney and two other City employees to discuss McPherson's allegations. Copenharve was presented with two alternatives at that meeting: he could either accept a suspension during the course of the City's investigation, or he could immediately resign. Even though Copenharve insisted that what happened between him and McPherson was consensual, he chose to resign on the spot rather than risk what he thought would be certain termination following an investigation.[3]

The City claims that its actions with respect to Copenharve were in compliance with its policy against sexual harassment, which both prohibited harassing behavior and identified the available avenues for reporting it. The City also maintained a "Workplace Violence" policy that encouraged employees to report incidents of violence.[4] McPherson was aware of the City's policies and procedures since she had previously complained about difficulties with another co-worker through the appropriate channels. Additionally,

---

[3] Copenharve was also indicted by a Lake County Grand Jury. He was arrested and charged with criminal sexual assault, criminal sexual abuse and battery. He pleaded guilty to attempted criminal sexual assault, resulting in his being placed on felony probation and ordered to register as a sex offender under Illinois law.

[4] McPherson does not contest the district court's finding that the City's antiharassment policies and procedures were adequate.

McPherson, as a member of the Service Employees International Union, was covered under a Collective Bargaining Agreement. That Agreement contained a "Non-Discrimination" clause and detailed grievance procedures members were to follow if a suspected breach occurred. McPherson neither filed a Union grievance about Copenharve's conduct nor reported Copenharve's behavior to the City until her March 27, 2001 meeting with Vanderventer.

Even though McPherson did not request it, the City granted her thirty days of paid leave beginning on March 28, 2001, which was not counted against any of her accrued time. On April 26, 2001, McPherson was informed by the City that she could take an additional twenty-two days of paid leave, comprising her remaining sick, personal and vacation time. She was advised that if she felt she needed more time after that, she would have to apply for a discretionary leave of absence. With her paid leave nearly used up, on May 10, 2001, McPherson wrote to the City and demanded an additional ninety days of paid leave with full benefits. On June 6, 2001, McPherson's attorney followed up with an inquiry about the status of McPherson's employment with the City. On June 28, 2001, the City responded to McPherson's attorney's inquiry, stating that Copenharve had resigned; that the "hostile work environment" perceived by McPherson could no longer possibly exist; that McPherson was still considered on "active but unpaid" status; that her position was being filled on a temporary basis due to the Department's workload but remained available to her upon her return to work; and that McPherson was currently considered absent without leave, which put her employment at risk. (SA at 8.) The City ended its letter by stating that it hoped McPherson, whom it considered a valued employee, would return to work soon. Later that same day, McPherson's attorney wrote back to the City, effectively tendering McPherson's resignation. The

letter stated that McPherson felt unable to "return to a work place that permitted sexual intimidation and created a hostile work environment." *Id.* At some point after McPherson's last day in the office, the City arranged for her belongings to be packed and informed her that she should come pick them up. The City also asked her to return certain items of City property.

This lawsuit followed McPherson's resignation. McPherson alleged state law claims of battery and intentional infliction of emotional distress against Copenharve. Against the City, she brought a claim of sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* She additionally claimed that the City was liable for Copenharve's torts under a theory of respondeat superior and that the City should indemnify any judgment against Copenharve on her state law claims against him.

The City moved for summary judgment on the three claims against it. The district court granted summary judgment to the City on McPherson's Title VII claim, finding that a hostile work environment first existed on March 21 (which the City does not dispute) but that the City was not strictly liable for Copenharve's conduct because the so-called *Faragher/Ellerth* affirmative defense precluded its liability. The City was also granted summary judgment on McPherson's state law respondeat superior claim based on the court's determination that it was preempted by the Illinois Workers' Compensation Act. Last, the City was granted summary judgment on McPherson's indemnification claim because the district court found that Copenharve's actions had not been within the scope of his employment. McPherson appeals the district court's disposition of each of these claims.[5]

---

[5] Following the district court's grant of summary judgment to the City on the three counts against it, the district court declined to

(continued...)

## II.

We review the district court's grant of summary judgment de novo. *Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001). To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 273, 106 S. Ct. 2548, 2552 (1986). In making this determination the court must "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 370 (7th Cir. 1992) (quoting *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir. 1990)). We address each of McPherson's claims in turn.

### A.

Title VII forbids an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.

42 U.S.C. § 2000e-2(a)(1). McPherson claims that the City violated Title VII by subjecting her to a hostile work environment based on sexual harassment that ultimately led to her constructive discharge. In order for McPherson to prevail on a claim of sexual harassment based on hostile work environment, she must establish that: (1) she was

---

(...continued)
exercise supplemental jurisdiction over McPherson's two remaining state law claims, which were against Copenharve but not the City.

subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *Robinson v. Sappington*, 351 F.3d 317, 328-29 (7th Cir. 2003), *cert. denied*, 124 S. Ct. 2909 (June 28, 2004) (internal quotation and citations omitted).

The City concedes that a sexually harassing hostile work environment existed as of March 21, 2001 when Copenharve first physically touched McPherson. (Appellee's Br. at 15.) However, McPherson claims that, when construed in her favor, the facts establish that the City became aware of Copenharve's offensive conduct much earlier than that, yet it failed to take any action to correct his behavior. McPherson further claims that the City's inaction, coupled with its actions after Copenharve resigned, led to her constructive discharge and triggered strict liability. We first address whether a hostile work environment existed prior to the March 21, 2001 incident.

**1.**

To prove that a hostile work environment existed, McPherson must put forth sufficient evidence that she was subjected to conduct "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (internal citation omitted)). To qualify as hostile, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (quoting *Faragher*, 524 U.S. at 787); *Hostetler v.*

*Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). In determining whether McPherson's work environment was objectively hostile, we must consider all of the circumstances, including the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with her work. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004).

We have previously observed that determining when sexual harassment is actionable "is not always easy." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). In *Baskerville*, we described the challenges facing courts in deciding where to draw the line:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. . . . It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other . . . .

*Id.* at 430-31 (internal citations omitted).

Since our decision in *Baskerville*, we have on many occasions distinguished between harassing and merely objectionable conduct. *See*, *e.g.*, *Hilt-Dyson*, 282 F.3d at 463-64 (holding that plaintiff's allegations that supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a sufficient inference of a hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that plaintiff's complaints of eight gender-related comments during course

of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," insufficient to demonstrate hostile work environment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding plaintiff's complaints of teasing, ambiguous comments about bananas, rubber bands and low-neck tops, staring and attempts to make eye contact and four isolated incidents where a co-worker briefly touched her arm, fingers or buttocks did not constitute sexual harassment). With these precedents in mind, we conclude that the incidents that occurred prior to Copenharve's physical assault of McPherson on March 21, 2001, although boorish, do not constitute the severe or pervasive conduct necessary to create an objectively hostile work environment in violation of Title VII. While Copenharve's inquiries about what color bra McPherson was wearing, his suggestive tone of voice when asking her whether he could "make a house call" when she called in sick and the one occasion when he pulled back her tank top with his fingers were lamentably inappropriate, we agree with the district court that, due to the limited nature and frequency of the objectionable conduct, a hostile work environment did not exist until the March 21, 2001 assault.[6] That said, we next consider the question of the City's liability for Copenharve's actions of March 21 and 26, 2001.

**2.**

When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

---

[6] We also agree with the district court's finding that McPherson offered no evidence that she subjectively found Copenharve's questions and remarks offensive.

One such affirmative defense was set out in the companion cases of *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998) and *Faragher*, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998). In *Ellerth*, the Court stated:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment.

524 U.S. at 765. Thus, in order for the *Faragher/Ellerth* defense to be available to an employer, the employer must not have taken a tangible employment action against the employee.

McPherson claims that the district court erroneously allowed the City to assert the *Faragher/Ellerth* affirmative defense because she was constructively discharged, and her constructive discharge constituted a tangible employment action. The City argues that there was no constructive discharge and hence no tangible employment action, and that it was entitled to invoke (and, in fact, met the burdens imposed by) the *Faragher/Ellerth* affirmative defense. If the plaintiff is unable to show that a tangible employment

action took place, the employer is entitled to raise the *Faragher/Ellerth* defense.

**a.**

In order to show that a hostile work environment resulted in her constructive discharge, McPherson must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response. *Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2346, 159 L. Ed. 2d 204, 211 (2004). Constructive discharge refers to a situation "in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). The "working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *Robinson*, 351 F.3d at 336; *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 1998) (quoting *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)). Because we have earlier found that a hostile work environment did not exist prior to March 21, 2001, we need only determine whether the work environment after that date was so egregious that McPherson was compelled to resign.

The undisputed facts establish that a hostile work environment did not result in McPherson's constructive discharge. Within hours of learning of McPherson's allegations against Copenharve on March 27, 2001, the City convened a meeting during which it demanded that he either submit his resignation or face suspension during the pendency of its investigation. Copenharve chose to resign. McPherson, on the other hand, chose to resign months after Copenharve's resignation, when the hostile working conditions created by

Copenharve were long gone. McPherson has offered no facts to show that her resignation was "an appropriate response" to an intolerable work environment.

McPherson also argues that she was constructively discharged by the City's packing up her belongings, requesting return of items it owned and filling her position with a temporary employee. According to McPherson, those actions made her feel that she would not have been welcome if she returned to her position. She argues that the district court ignored those acts of the City when deciding that there had been no constructive discharge. But in its letters to the plaintiff, the City encouraged McPherson to return to work and offered her the prospect of additional discretionary leave if she felt she needed more time before returning to work. It informed her that since Copenharve had resigned, she need not fear that her return to work for the City would mean a return to a sexually harassing work environment. "[A]n employee can be constructively discharged only if the underlying working conditions were themselves unlawful or discriminatory in some fashion." *Gawley v. Ind. Univ.*, 276 F.3d 301, 315 (7th Cir. 2001) (internal citation omitted). The City appears to have made every effort to communicate to McPherson that her position was open and available to her as soon as she was ready to return. Because it acted as any reasonable employer would when one of its employees is on extended leave, these acts of the City fail to constitute a constructive discharge. McPherson thus cannot have suffered a tangible employment action, and the City was entitled to raise the *Faragher/Ellerth* affirmative defense.

#### b.

The first element of this affirmative defense requires the City to show that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior. McPherson argues that the City failed to take any action to stop Copenharve's behavior even though it knew that he

was harassing women in the office and thus failed to meet its obligation. To bolster her argument, she refers to the testimony of her co-worker, Michelle Brewington, which corroborates McPherson's allegations about the inappropriate questions Copenharve asked the female employees as a group and her claims that Nieves and Weland, the office supervisor and office manager, had overheard these remarks. But as the district court correctly pointed out, the facts show only that Nieves and Weland overheard Copenharve ask this question to the female staff on at least one occasion. There is no evidence that either Nieves or Weland was aware that Copenharve ever singled out individual employees for his off-color questioning. Even assuming for the sake of argument that knowledge of Copenharve's comments to the group should be imputed to the City, the comments on their own did not amount to an actionable hostile work environment, and there is no reason they would have put the City on notice that Copenharve's behavior would escalate two years later into a physical assault of McPherson. As for the events of March 21 and 26, 2001, the City could not have known about those incidents until McPherson reported them because they occurred inside Copenharve's office, out of sight of co-workers. An employer cannot be considered to have knowledge of sexual harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (citations omitted).[7] As soon as it learned that Copenharve had sex-

---

[7] We have found that "notice may be presumed where the work environment is permeated with pervasive harassment." *Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999). But here, the only behavior the City was arguably on notice of was Copenharve's occasional jocular questions to the group of female employees about the color of their bras—inappropriate, to be sure, but not rising to the level of sexual harassment. "[W]hen, as in this case,

(continued...)

ually harassed McPherson, the City acted immediately to investigate, correct and prevent future recurrences of Copenharve's behavior. The City met its burden with respect to the first element of the affirmative defense.

As for the second element, the district court found that the City had adequate preventive and remedial policies in place to protect its employees from harassment and violence, and McPherson concedes that she failed to avail herself of those policies and that she did not report Copenharve's conduct until March 27, 2001. (Appellant's Br. at 4.) Nor did she file a grievance with her Union. McPherson's complaint that "[t]he district court put the entire burden on [her] to take some action against her supervisor" (Appellant's Br. at 18) amounts to nothing more than dissatisfaction with the requirements of the law. The Supreme Court noted in *Faragher* that Title VII's " 'primary objective' . . . is not to provide redress but to avoid harm." 524 U.S. at 806 (1998) (citation omitted). The "burden" of which McPherson complains is nothing more than an

> obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. . . . If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care . . . .

---

(...continued)

the only possible source of notice to the employer . . . is the employee who is being harassed, she cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Zimmerman v. Cook County Sheriffs Dept.*, 96 F.3d 1017, 1019 (7th Cir. 1996).

*Id.* at 806-07 (internal citations omitted). Since McPherson does not dispute that the City acted reasonably in maintaining and in disseminating to its employees policies and procedures for addressing and preventing sexual harassment, the burden *was* on McPherson to avail herself of these policies and procedures that she well knew were available to her. Of course, it was the City's burden to show she had unreasonably failed to do so—a burden which the City has met.

Because we find that McPherson was not constructively discharged, there was no tangible employment action barring the City from raising the *Faragher/Ellerth* affirmative defense. The City has shown that the *Faragher/ Ellerth* defense precludes its liability for Copenharve's actions, and summary judgment in favor of the City was therefore proper on McPherson's Title VII claim.

## B.

In addition to Title VII liability, McPherson had alleged liability under a respondeat superior theory for certain state law torts committed by Copenharve. Here, the district court correctly noted that respondeat superior liability is not available to overcome the preemptive effect of the Illinois Workers Compensation Act (IWCA), 820 ILCS 305/5(a). The IWCA is an employee's exclusive remedy for "accidental" injuries arising out of and in the course of employment. "The meaning of 'accidental injury' as used in the Illinois Workmen's Compensation Act has been defined as an injury which is traceable to a definite time, place and cause, and occurs in the course of employment unexpectedly and without affirmative act or design of the employee." *Hales & Hunter Co. v. Industrial Com.*, 31 Ill. 2d 139, 141 (Ill. 1964). The Illinois Supreme Court has explained that intentional torts committed by co-employees are nonetheless considered "accidental" for the purposes of the IWCA:

> Unless the employer has commanded or expressly authorized the assault, it cannot be said to be intentional from his standpoint any more than from the standpoint of any third person. Realistically, it to him is just one more industrial mishap in the factory, of the sort he has the right to consider exclusively covered by the compensation system.

*Meerbrey v. Marshall Field & Co., Inc.*, 564 N.E.2d 1222, 1227 (Ill. 1990) (quoting 2A A. Larson, Law of Workmen's Compensation § 68.21 (1988)). One way an employee can avoid preemption is by showing that his or her injuries were not "accidental."[8] *See Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 323 n.4 (7th Cir. 1992). To show that her injuries were not accidental, McPherson must do more than merely show that Copenharve acted within the scope of his employment. *Id.* In order to avoid preemption, McPherson must establish that the City itself "has committed, commanded, or expressly authorized" the torts against her. *Id.* The district court found that the City did not do so, since it lacked knowledge of Copenharve's sexual harassment until March 27, 2001, at which point it responded immediately and effectively.

McPherson concedes that the City cannot be liable under a respondeat superior theory for Copenharve's tortious acts. Instead, she argues that the IWCA does not preempt her claims because management knew that Copenharve was making comments about the color of the female office workers' bras and did nothing, thus expressly authorizing his actions and creating an environment in which those ac-

---

[8] There are three other ways in which an employee can avoid preemption, though none of them is relevant here. The employee can prove that the injury did not arise from his or her employment; that the injury was not received during the course of employment; or that the injury was non-compensable under the IWCA. *See Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 323 n.4 (7th Cir. 1992).

tions were permitted to escalate. *See Thomas v. Habitat Co.*, 213 F. Supp. 2d 887, 892 (N.D. Ill. 2002) (holding that "management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct"). McPherson faces the same problem here that she did with her Title VII claim. As we have already found, the City was not aware of Copenharve's sexually harassing behavior until March 27, 2001, at which point it acted promptly and effectively to rectify the situation. Even if we were to impute to the City Nieves' and Weland's knowledge that Copenharve asked the female employees *as a group* inappropriate questions about the color of their bras, McPherson has presented no facts even hinting that the City would or should have believed that Copenharve had any particular interest in her or that these comments would suddenly escalate two years later into a full-blown physical assault. There is also no evidence that the City "commanded or expressly authorized the assault." *Meerbrey*, 564 N.E.2d at 1227 (quoting 2A A. Larson, Law of Workmen's Compensation § 68.21 (1988)). Because the City took action immediately upon receiving McPherson's complaint and because the City could not have known any earlier that Copenharve posed a risk to McPherson, summary judgment in favor of the City on this claim was proper.

## C.

Finally, McPherson argues that there is a genuine issue of material fact as to the City's knowledge of Copenharve's behavior that precludes entry of summary judgment on her indemnity claim. The district court found that the City was immune under the Illinois Tort Immunity Act (ITIA), which provides that "a local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable." 745 ILCS

10/9-102 (2002). Since the district court found that Copenharve's conduct was not within the scope of his employment and that the City could not have reasonably anticipated Copenarve's allegedly tortious acts, it granted summary judgment in the City's favor.

An employer is generally liable for an intentional tort committed by an employee only when the tort was in furtherance of his employment, "that is, only if the employee's motive, or at least *a* motive, in committing the tort was to serve his employer." *Doe v. City of Chicago*, 360 F.3d 667, 670 (7th Cir.), *reh'g denied*, 2004 U.S. App. LEXIS 5662 (2004) (emphasis in original). Citing *Dorsey v. Givens*, 209 F. Supp. 2d 850 (N.D. Ill. 2001), out of context, McPherson argues that because Copenharve's sexual misconduct occurred during working hours at a City building and Copenharve had lured her into his office on an ostensibly work-related matter, the City could reasonably expect that Copenharve would become sexually abusive toward McPherson in the course of his employment. McPherson misses the point. Unlike McPherson's respondeat superior claim, the focus here is on whether Copenharve's misconduct was within the scope of his employment, not on whether the City knew that supervisors might sexually harass subordinates.[9] Of course, employers are aware of the possibility that supervisors might sexually harass employees while at work; this is, unfortunately, a fact of working life. But unlike *Dorsey*, which involved a male correctional officer who was alleged to have improperly touched a female inmate, Copenharve's job did not involve the opportunity for abuse inherent in "the exercise of officially sanctioned coercive power by a male over a female." *Dorsey*, 209 F. Supp.

---

[9]  To the extent the City's knowledge of Copenharve's behavior is relevant to McPherson's indemnity claim, we have already determined that the City did not know or have any reason to know that McPherson was in any danger from Copenharve.

2d at 852. McPherson has not presented any reason why the scope of Copenharve's employment would encompass the sexual misconduct she complains of.[10] *Id.*; *see also Webb v. Jewel Cos., Inc.*, 137 Ill. App. 3d 1004, 92 Ill. Dec. 598, 601-02, 485 N.E.2d 409, 412-13 (Ill. Ct. App. 1985) (holding that sexual assault, whether rape or fondling, had no relation to the business of the employer). Thus, according to the ITIA, the City is not required to indemnify any judgment McPherson may obtain against Copenharve.[11]

Because there are no material facts on which a jury could

---

[10] We also note that in *Dorsey*, the district court felt unable to "predict that the Illinois courts would conclude that the sexual misconduct alleged here is within the scope of employment, justifying indemnification." *Dorsey*, 209 F. Supp. at 853. Thus, not even *Dorsey*—the only case cited by McPherson in support of this claim—found that sexual misconduct was within the scope of the harasser's employment and thus indemnifiable.

[11] McPherson's characterization of the City as having knowledge of Copenharve's misconduct, yet doing nothing to protect its female employees, is also contradicted by the facts. First, the City was unaware of Copenharve's "inappropriate sexual behavior directed toward" McPherson because she had not informed anyone that Copenharve's behavior went beyond the occasional inappropriate question about bra color to the *group* of female employees. (Appellant's Br. at 21.) Second, Nieves' and Weland's knowledge that Copenharve had occasionally asked this question of the group is, as we have concluded, not sufficient to put the City on notice that Copenharve was singling out McPherson or that his behavior might one day escalate into a sexual assault. Finally, the City *did* do something to protect its female employees: it promulgated policies and procedures designed to effectively deal with sexual harassment, it made its employees (including McPherson) aware of them, and it responded swiftly and effectively to McPherson's eventual complaint about Copenharve. Even if knowledge and lack of action were enough for McPherson to prevail, she has not shown that either of them existed here.

base a finding that the City should indemnify any judgment McPherson may obtain against Copenharve, summary judgment in favor of the City on this claim was proper.


### III.

We do not condone the objectionable acts and offensive sexual misconduct that McPherson's supervisor un-disputably committed. But the facts of this case demon-strate that the City acted reasonably in responding to McPherson's complaint, and, as a matter of law, the City was not liable for those acts. For the foregoing reasons, the judgment of the district court is AFFIRMED.


A true Copy:

      Teste:


                    _____

                    *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*